### 3726.  LANGSTON *v.* THE STATE.

No error of law appears, and the verdict is supported by some evidence.

DECIDED NOVEMBER 7, 1911.

Conviction of voluntary manslaughter; from Cherokee superior court—Judge Morris.  September 9, 1910.

*Howell Brooke, Gober & Griffin,* for plaintiff in error.
*J. P. Brooke, solicilor-general,* contra.

HILL, C. J. The facts of this case present another of the daily occurring instances showing the monstrous and measureless evil of intoxicating liquors. This hydra-headed and remorseless monster, with ceaseless and tireless energy, wastes the substance of the poor,

manufactures burdensome taxes for the public, monopolizes the valuable time of the courts, fills jails, penitentiaries, and asylums, ruins homes, destroys manhood, terrorizes helpless women and innocent children, baffles the church, and mocks the law, and, answering its inexorable demands, "each new morn new widows mourn, new orphans cry, new wrongs strike Heaven in the face." These are the products of a curse not imposed by the decree of God, but self-inflicted by the voluntary conduct of man, its weak and wicked victim. Judges of criminal courts, speaking from official experience, have grown weary in calling attention to the drink habit as the principal cause of crime, and nothing that the writer could say would add to this manifest truth. But I can not refrain from saying that, after five years' observation of the cases that have been before this court, three fourths of the crimes are due directly or indirectly to the excessive use of intoxicants, and that, if the church and the State and public sentiment could unitedly make Georgia sober, the prisons would be vacant, the chain-gangs empty, and cities, towns, and country would be filled with prosperous people and happy homes. The grand English premier did not exaggerate when he declared that "greater calamities have been inflicted on mankind by intemperance than by the three great historic scourges, war, pestilence, and famine," and that this evil is "the measure of a nation's discredit and disgrace."

We have been led to say this much because of the sad tragedy disclosed by the horrible facts of this record. A husband, "beastly drunk," goes to his home at night, finds his sick wife in bed, and, with brutal curses and violent threats to kill, drives her into the night and from home. The accused, their 19-year-old son, resents this cruel treatment of his mother, and reproaches the father for his brutal language and cruel conduct. The father, frenzied with liquor, immediately turns on his son, curses him, knocks him down with a chair, cuts him with a knife, and threatens to kill him. The son (as he contended, in self-defense, but, as found by the jury, under the excitement of passion aroused by these attacks) picks up a rock from the floor, where it was placed to prop open the door, hurls it at his father, hits him on the head, and from the wound thus inflicted death ensues on the following day.

A careful review of the evidence convinces us that it largely preponderates in favor of the plea of self-defense. Yet we can not say

that the verdict of voluntary manslaughter is not supported by some slight evidence, and to this standard of mental conviction we must come before we would be authorized to set aside the verdict on the general grounds. The evidence in support of the verdict is that the son, angered by his father's conduct, "cursed him back," did not decline the struggle and leave the house, and, according to one witness, threw the rock after he had been knocked down and cut and when his father, although continuing to curse him and threatening to take his life, was not actually advancing upon him and manifesting a present intention to carry out his threats; in other words, that it was a case of mutual combat, and the accused threw the fatal stone with David-like precision and force, angered and provoked by the previous attacks, when there was no actual or apparent necessity for him to have done so in self-defense.

We do not hesitate to state that if it were our province, or we had the right to weigh the evidence and decide the issue of fact, we would grant another trial, because the evidence in favor of the plea of self-defense is so strong, and that in support of voluntary manslaughter, or any other offense, is so weak. Entertaining this opinion of the evidence, we have most carefully examined the assignments, to find, if we could, any material legal error. We have failed in our search. The assignments of error of law consist of objections to several excerpts from the charge. Separately considered, these excerpts contain no material error, and raise no novel, doubtful, or interesting question of law. When they are examined in connection with the entire charge, we are forced to the conviction that the law was fully, fairly, and correctly presented on every issue made by the evidence.

The attending physician testified that shortly before his death the decedent had several convulsions, and he "apprehended" that death would soon follow. This opinion was admitted in evidence over the objection of the accused. We think the evidence was competent; but, even if not, its admission was harmless error. The decedent did shortly die, and, according to the opinion of the physician, his death was caused by the wound on the head inflicted by the accused.

The evidence showed that the decedent was a man of great violence when under the influence of liquor, and that he was much larger and stronger than the accused. It is contended by learned

counsel that the trial judge, without request, should have instructed the jury "as to the law touching the violent character of the deceased and the great disparity in his size and that of the accused." We have no clear opinion or exact knowledge as to what would be the law on this subject that the judge was called upon to charge, and we have received no assistance from learned counsel on this point. We are therefore inclined to think that the jury, especially where a mutual combat or struggle was shown, could be safely relied upon to deal with these questions without the aid of any rule of law. The violent character of one party, and the relative strength and size of two parties engaged in a mutual combat, or where an assault and struggle took place, so forcibly and necessarily illustrate the issue of guilt or innocence that he would be a profoundly stupid juror who would not give these questions full weight and significance, even without any suggestion from the court as to his right to do so.

We repeat that we affirm the judgment because we find no legal error in the trial, and there is some slight evidence to support the verdict. We doubt not that the learned trial judge, if he has not already imposed a merciful sentence, will do so, and will humanely temper justice with a large and generous clemency.

*Judgment affirmed.*